## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD.,** <br> No. 88 Weilai 3rd Road <br> East Lake High-tech Development Zone <br> Wuhan, Hubei, 430205, China; <br><br> **YANGTZE MEMORY TECHNOLOGIES (JAPAN), INC.,** <br> Daiwa Akasaka Building 4F <br> 2-14-5 Akasaka, Minato-ku <br> Tokyo 107-0052, Japan; and <br><br> **YANGTZE MEMORY TECHNOLOGIES, INC.,** <br> 2953 Bunker Hill Lane, Suite 206 <br> Santa Clara, California 95054, <br><br>      *Plaintiffs,* <br><br>      v. <br><br> **U.S. DEPARTMENT OF COMMERCE** <br> 1401 Constitution Avenue, NW <br> Washington, DC 20230; <br><br> **BUREAU OF INDUSTRY AND SECURITY;** <br> 1401 Constitution Avenue, NW <br> Washington, DC 20230; <br><br> **END-USER REVIEW COMMITTEE;** <br> 1401 Constitution Avenue, NW <br> Washington, DC 20230; and <br><br> **HOWARD W. LUTNICK, in his official capacity as SECRETARY OF COMMERCE,** <br> 1401 Constitution Avenue, NW <br> Washington, DC 20230, <br><br>      *Defendants.* | **Civil Action No. 25-4245** <br><br><br><br><br><br><br> **COMPLAINT** |

Plaintiffs Yangtze Memory Technologies Company, Ltd. ("YMTC"), Yangtze Memory Technologies (Japan), Inc. ("YMTJ"), and Yangtze Memory Technologies, Inc. ("YMTI") bring this action against Defendants U.S. Department of Commerce ("Commerce Department" or "Commerce"); the Bureau of Industry and Security ("BIS"); the End-User Review Committee ("ERC" or "Committee"); and Howard W. Lutnick, in his official capacity as Secretary of Commerce. In support thereof, upon direct knowledge as well as upon information and belief, Plaintiffs allege:

## NATURE OF THE ACTION

1.    Plaintiffs YMTC, YMTJ, and YMTI bring this action to challenge Defendants' procedurally defective, *ultra vires*, and unconstitutional placement of YMTC and YMTJ on the U.S. Department of Commerce's Entity List in December 2022. Defendants' action has caused ongoing and irreparable harm to Plaintiffs' business operations and reputations, despite Plaintiffs' longstanding compliance with U.S. export control laws—complianince that Defendants themselves have not disputed. Indeed, Defendants have never alleged that Plaintiffs have engaged in any unlawful conduct. On information and belief, the addition of YMTC and YMTJ to the Entity List originated with a commercially motivated lobbying campaign by a YMTC competitor relying on inaccurate information and innuendo.

2.    YMTC is a global leader in the development and production of 3D NAND flash memory chips used in smartphones, laptops, and other everyday consumer electronics. YMTC's subsidiary YMTJ, based in Japan, promotes YMTC products in Japan and South Korea and provides related customer service in those markets. YMTC's subsidiary YMTI, based in California, was formed to advance YMTC's business in the United States.

3.    Since YMTC's establishment, Plaintiffs have maintained a robust export compliance program crafted by U.S. export control compliance experts, and Defendants have never accused Plaintiffs of knowingly violating U.S. export control laws.

4.    Neither YMTC, YMTJ, nor YMTI has knowingly supplied any goods or technology for military or intelligence application.  Nor are Plaintiffs' products designed to be so employed.

5.    As a compliant participant in the global market, YMTC has long conducted business and maintained close ties with the United States and U.S. suppliers, including through YMTC's own personnel present in the United States and through its subsidiary YMTI.

6.    Defendants are responsible for enforcing the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801-4852, and the Export Administration Regulations ("EAR"), 15 C.F.R. pts. 730-774, and for maintaining the Entity List.

7.    The Entity List designates foreign parties that are prohibited from receiving certain items subject to the EAR unless the exporter secures a license.  Parties on the Entity List are effectively excluded from the U.S. marketplace both because of legal restrictions on receiving software, technology, and other items, and also because of the stigma attached to the Entity List.  That stigma—beyond the legal restrictions—deters U.S. and other businesses from conducting otherwise lawful business with listed companies, because of increased due diligence and compliance costs and because those businesses fear being targeted themselves for continuing their otherwise lawful transactions with listed companies.

8.    Despite Plaintiffs' record of compliance and cooperation with the U.S. government, Defendants issued a final rule in December 2022 (the "December 2022 Final Rule" or "Final Rule") that placed YMTC, YMTJ, and 34 other unaffiliated Chinese entities on the Entity List.

*See* Additions and Revisions to the Entity List and Conforming Removal From the Unverified List, 87 Fed. Reg. 77505 (Dec. 19, 2022).

9.     BIS's Entity List procedures, which Congress ratified through ECRA, require that all decisions to add parties to the Entity List be made by the End-User Review Committee ("ERC"), acting upon a proposal submitted by one of the ERC's member agencies.  *See* 15 C.F.R. pt. 744, Suppl. No. 5.  If a majority of the ERC's member agencies agree to add a party to the Entity List, then the ERC—acting as a committee—formally makes that decision.  *Id.*  The resulting determination is then published in the Federal Register.  That decision communicates that the ERC has discharged its procedural responsibilities, typically by stating that "the ERC has determined" to add that party to the Entity List.

10.     The Entity List decision-making process itself is opaque to the public and listed parties alike.  This lack of transparency in the implementation of the Entity List's governing procedures compounds the harm caused by legally deficient listings.

11.     Here, the scant public record, as reflected in the December 2022 Final Rule, establishes that YMTC and YMTJ were subjected to an anomalous listing process.  Upon information and belief, these anomalies reflect defects in the Entity List process concerning YMTC and YMTJ.

12.     The Final Rule set forth YMTC and YMTJ's addition to the List as follows:

> ***The agencies represented on the ERC determined*** to add [YMTC and YMTJ] … to the Entity List for posing a significant risk of becoming involved in activities contrary to the national security or foreign policy interests of the United States. ***This request*** is based on information indicating that these companies present a risk of diversion to parties on the Entity List, to include Huawei Technologies Co., Ltd., and Hangzhou Hikvision Digital Technology Co., Ltd. ***This activity*** is contrary to the national security or foreign policy interests of the United States under § 744.11(b) of the EAR.

87 Fed. Reg. at 77506 (emphases added).  This recitation was anomalous in at least three ways.

13.    *First*, the December 2022 Final Rule deviated from standard practice because it did not state that "the ERC" determined to add YMTC and YMTJ to the Entity List.  When BIS's Federal Register notices identify the body that decided to add a party to the Entity List, they usually state that "the ERC," as a collective body, made that determination.  This standard phrasing reflects the statutory and regulatory procedures governing additions to the Entity List, which vest decision-making authority in the ERC.  The December 2022 Final Rule used this standard phrasing when stating that "the ERC determined" to add several dozen *other* parties to the Entity List.  But when announcing the addition of YMTC and YMTJ to the Entity List, the Final Rule departed from this language, stating instead that "*the agencies represented on* the ERC" made the determination.  *See* 87 Fed. Reg. at 77506 (emphasis added).  BIS's choice of this specific phrase only for *this* paragraph of the Final Rule reflects that the addition of YMTC and YMTJ to the Entity List was not the product of the ERC's own deliberations, but of some atypical process.

14.    *Second*, the December 2022 Final Rule revealed that YMTC and YMTJ were added to the Entity List based on an unspecified "request."  The Final Rule did not identify the provenance of the "request" or the identity of the requester, and the procedures governing the ERC's *additions* to the Entity List make no references to "request[s]."  On information and belief, this sentence in the Final Rule is the only time that BIS's Federal Register notices have ever cited a "request" to *add* a party to the Entity List.  BIS's choice of the word "request" for use only in *this* paragraph of the Final Rule further reflects that the addition of YMTC and YMTJ was the product of an atypical process.

15.    *Third*, the December 2022 Final Rule did not identify any "activity" undertaken by YMTC or YMTJ as grounds for their addition to the Entity List.  Instead, it used the phrase "this activity" to refer only to YMTC and YMTJ passively "present[ing]" a vague "risk of diversion" to

other listed parties—without citing any conduct (whether action *or* inaction) by YMTC or YMTJ that might have given rise to such risk. *See* 87 Fed. Reg. at 77506. By contrast, for several dozen other parties that were added to the Entity List that day, BIS cited conduct attributable to those parties, as it has done routinely in other Entity List rulemakings before and after this one.

16.     On information and belief, and as detailed further herein, the "request" to add YMTC and YMTJ to the Entity List was initiated by a party outside the legally prescribed ERC interagency process, and it was improperly influenced by YMTC's competitors and their lobbyists urging officials in the administration of President Joseph R. Biden to list YMTC and YMTJ. On information and belief, this lobbying effort was intended to secure a competitive advantage by undermining YMTC's global operations. On information and belief, those external private actors incorrectly characterized YMTC's historical sales to Huawei—which, at the time they took place, were entirely lawful for YMTC and its competitors alike—as nefarious activity. On information and belief, those private actors then pressed U.S. officials behind closed doors, in the Executive Office of the President and elsewhere, and requested that they add YMTC to the Entity List. On information and belief, when Biden administration officials eventually acted to place YMTC and YMTJ on the Entity List, they did so without the ERC's exercise of the deliberation and discretion required by law, thereby circumventing the Entity List's statutory and regulatory designation process.

17.     Beyond these procedural irregularities, Defendants placed YMTC and YMTJ on the Entity List without prior notice, and without any opportunity to rebut the specific evidence (if any) upon which Defendants relied for the listing.

18.     The harm to Plaintiffs has been substantial and enduring. The listing instantly cut YMTC off from its U.S. suppliers and service providers, impaired its global competitiveness, and

stigmatized it in the marketplace as a "bad actor" and supposed national security threat.  YMTC's U.S. subsidiary YMTI has been unable to carry out its business and has been tainted by association, losing prospective customers, employees, and even one of its banking relationships.

19.    Since the December 2022 Final Rule was issued, YMTC and YMTJ have submitted to Defendants formal requests for removal from the Entity List; produced substantial information to address whatever (undisclosed) concerns prompted Defendants to add YMTC and YMTJ to the Entity List; and detailed YMTC's history of commitment to U.S. export control compliance and the measures that YMTC has implemented, and would be willing to implement, in order to be removed from the Entity List.

20.    Defendants have not yet acted on these requests for removal from the Entity List, despite YMTC and YMTJ's good-faith engagement with the U.S. government over several years. Nor have Defendants communicated to YMTC or YMTJ any allegations of wrongful conduct or provided any guidance about how YMTC and YMTJ can prove a negative—namely, that they do *not* "present a risk of diversion."[1]

21.    Plaintiffs bring this action to vacate the unlawful placement of YMTC and YMTJ on the Entity List; to compel the government to follow the procedural and substantive limits imposed by the Constitution, Congress, and Defendants' own regulations; and to restore the rule of law to an administrative process that, on information and belief, has been distorted to serve private commercial interests and stifle lawful competition in the global marketplace.

---

[1] Consistent with the obligations imposed by Local Civil Rule 7(n), Defendants must provide Plaintiffs the administrative record underlying the challenged action here.  *See* Local Civ. R. 7(n)(1)-(2) (requiring, in cases involving judicial review of agency action, that the parties jointly prepare an appendix of relevant administrative record excerpts for submission to the Court).

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

23.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and the Court's inherent equitable powers.

24.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

## PARTIES

25.     Plaintiff Yangtze Memory Technologies Company, Ltd. is a leading developer and manufacturer of 3D NAND flash memory and related storage technologies.    YMTC is headquartered in China.

26.     Plaintiff Yangtze Memory Technologies (Japan), Inc. is a wholly owned subsidiary of YMTC based in Japan.    YMTJ promotes YMTC products in Japan and South Korea and provides related technical support and customer service in those markets.    YMTJ does not design, manufacture, or export any products.

27.     Plaintiff Yangtze Memory Technologies, Inc. is a California corporation and wholly owned U.S. subsidiary of YMTC.    YMTI's principal place of business is in California.

28.     Defendant U.S. Department of Commerce is an agency of the United States Government.    Its principal offices are in Washington, D.C.    The Commerce Department amended the EAR by adding YMTC and YMTJ to the Entity List.    *See* 87 Fed. Reg. at 77505.

29.     Defendant Bureau of Industry and Security is a component of the Commerce Department.    Its principal offices are in Washington, D.C.    BIS published the December 2022 Final Rule that placed YMTC and YMTJ on the Entity List.    *See* 87 Fed. Reg. at 77505.

30.     Defendant End-User Review Committee is a component of the Commerce Department.    Its principal offices are in Washington, D.C.    According to BIS's Entity List

procedures, the Committee "makes all decisions regarding additions to, removals from, or other modifications to the Entity List." 87 Fed. Reg. at 77506.

31.     Defendant Howard W. Lutnick, serving as the Secretary of Commerce, has his office in Washington, D.C.  Secretary Lutnick is sued only in an official capacity.  His predecessor in the Biden administration was legally responsible for overseeing the placement of YMTC and YMTJ on the Entity List, and Secretary Lutnick now maintains that list, pursuant to ECRA's mandate that the Commerce Secretary "shall … establish and maintain" the Entity List.  50 U.S.C. § 4813(a)(2).

## FACTUAL ALLEGATIONS

### I.     YMTC's Success and Connections to the United States

32.     Founded in 2016, YMTC is an integrated device manufacturer that specializes in developing memory products for the global market.

33.     YMTC has pioneered innovations in commercial 3D NAND flash memory chip design with exceptional bit densities, input/output speeds, and storage capacities.

34.     Flash memory chips are a non-volatile storage medium that allows common consumer electronics and appliances to store large sets of data even after a device is powered off.  Flash memory chips do not process that data; they only store it.

35.     YMTC's flash memory chips are commonly used in smartphones, televisions, and other consumer electronics and appliances that require memory chips to function.  YMTC supplies its products primarily to original equipment manufacturer ("OEM") clients, which are companies that incorporate YMTC components into their own branded devices.

36.     YMTC's flash memory chips are designed for commercial use, and they have never been covered by the Commerce Department's list of export-controlled sensitive or advanced technologies, known as the "Commerce Control List."

37.    YMTC's advancements in memory design have earned widespread industry recognition.  For example, in 2018, at the Flash Memory Summit in California, YMTC was awarded "Best of Show" for "Most Innovative Flash Memory Start-up Company" and was praised as a "champion of the storage industry."  At the same event in 2022, YMTC received the "Best of Show" award for "Most Innovative Memory Technology" for its Xtacking® 3.0 3D NAND architecture.  In 2023, TechInsights Inc.—an industry analysis platform that analyzes components inside consumer electronics—declared YMTC the "leader" in 3D NAND flash manufacturing.  In 2025, YMTC's Xtacking® 4.0 3D NAND technology received the Flash Memory Summit's "Best of Show" award for "Most Innovative Memory Technology."

38.    Since at least 2016, YMTC has maintained a presence within the United States. Since at least 2018, YMTC has owned property within the United States.

39.    From approximately 2016 through 2018, YMTC sent several dozen functional and research and development personnel to work within the United States in support of the creation of YMTC's U.S. subsidiary, YMTI.  These YMTC personnel held corporate roles related to finance, information technology, human resources, sales, design, and legal affairs.

40.    Since at least 2020, one of YMTC's senior in-house attorneys has been a U.S. citizen who continues to reside in the United States and conduct business for YMTC within the United States.

41.    YMTC has obtained numerous patents for its 3D NAND technology from Defendant Commerce Department through its U.S. Patent and Trademark Office, including many patents that were obtained before YMTC's placement on the Entity List.

42.    YMTC formed its wholly owned subsidiary YMTI in 2016 as a California corporation.  YMTI was originally formed to conduct research and development to support

YMTC's 3D NAND products and provide ongoing technical support for YMTC's chip fabrication facilities in China. YMTC employees residing in the United States also worked for YMTI. YMTC presently owns information technology devices located in YMTI's U.S. office, which YMTI's employees continue to use for work-related Internet access.

43.    As YMTC's operations grew, it established and maintained active commercial and technical relationships with equipment suppliers in the United States.

44.    Beginning around early 2017, YMTC entered contractual relationships with suppliers in the United States, from whom YMTC purchased critical tools, technologies, and services to support the development and manufacture of its 3D NAND products. From 2016 to 2022, YMTC spent substantial sums of money to procure items and services from these U.S. suppliers.

45.    YMTC's contracts with its U.S. suppliers were negotiated by YMTC personnel who traveled to the United States on multiple occasions.

46.    In 2022, YMTI, in partnership with YMTC, completed (or was in the process of completing) standards qualification for contracts with several prominent U.S. technology companies.

47.    YMTC has consistently and diligently sought to comply with U.S. export control laws and regulations (including the EAR) and other applicable laws. Since its establishment, YMTC has had in place an "Internal Compliance Program" designed to ensure the company's compliance with export control laws. YMTC's Internal Compliance Program was developed with the assistance of third-party U.S. export control experts and includes all export compliance program elements recommended by BIS in its compliance guidance. Among other things, YMTC screens potential customers to ensure that they do not pose foreseeable export control risks; obtains

from its customers written assurances ("End-Use Statement") that YMTC products must be handled in accordance with U.S. export controls; and periodically updates its compliance program to account for changing circumstances.

## II.    **Statutory and Regulatory Background**

48.    BIS is responsible for administering and maintaining certain U.S. export controls through the Export Administration Regulations, which govern exports of certain commodities, software, and technology. *See generally* 15 C.F.R. pts. 730-774.

49.    BIS also maintains the Entity List pursuant to ECRA's statutory instruction that the Secretary of Commerce "shall … establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in section 4811(2)(A) of [Title 50 of the U.S. Code]." 50 U.S.C. § 4813(a)(2). Section 4811(2)(A), in turn, provides that "[t]he national security and foreign policy of the United States require" controlling the release of items subject to the EAR for use in five enumerated contexts: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."

50.    BIS publishes the Entity List at Supplement No. 4 to Part 744 of Title 15 of the Code of Federal Regulations, as part of the EAR.

51.     Typically, companies and others placed on the Entity List cannot lawfully obtain items, software, and technology "subject to the EAR" without the exporter securing a license from the Department of Commerce.[2]

52.     Generally speaking, items "subject to the EAR" are: (i) all items of U.S. origin; (ii) all items in or transiting through the United States; (iii) foreign-made commodities that contain a certain amount of controlled U.S.-origin content; or (iv) certain items, known as "foreign direct products," that are foreign-produced but which were created using (or made at a facility reliant on) certain U.S. software or technology.  *See* 15 C.F.R. § 734.3(a)(1)-(5); *id.* § 734.9.

53.     BIS has issued several foreign-direct product ("FDP") rules that apply only to entities that are designated on the Entity List with certain "footnotes."  *See, e.g.*, 15 C.F.R. § 734.9(e)(1) (Footnote 1 rule).  These Entity List FDP rules operate to restrict the export, reexport, or transfer (in-country) of certain "foreign-direct products," as defined in the EAR, to recipients on the Entity List designated with the relevant footnote (*e.g.*, a Footnote 1 entity).

54.     When BIS adds entities to the Entity List, it also determines a "license review policy," which governs BIS's review of any application for a license to export to those entities. For listed entities, BIS commonly determines a license review policy of "presumption of denial" for all items subject to the EAR.  That is the license review policy that BIS set for YMTC and YMTJ when placing them on the Entity List.

55.     On information and belief, Defendants will deny all license applications for transactions with YMTC (and YMTJ), and they have already denied several such applications.

---

[2] "'Subject to the EAR' is a term used in the EAR to describe those items and activities over which BIS exercises regulatory jurisdiction under the EAR.  Conversely, items and activities that are not subject to the EAR are outside the regulatory jurisdiction of the EAR and are not affected by those regulations."  15 C.F.R. § 734.2(a)(1).

56.     Placement on the Entity List carries an official stigma.  BIS has stated that "transactions of any nature with listed entities carry a 'red flag' and … U.S. companies [should] proceed with caution with respect to such transactions."  Bureau of Indus. & Sec., Entity List FAQs (2020).  Therefore, even for items not subject to the EAR, parties must generally conduct additional due diligence before transacting with a company on the Entity List.  Such diligence can require significant compliance resources, which can deter prospective business partners from entering any relationship with companies on the Entity List.  As a result, placement on the Entity List can effectively exclude a company from the U.S. market.

57.     In 2008, BIS issued a final rule that promulgated a new regulation, codified at 15 C.F.R. § 744.11, setting forth the standards governing decisions to add a party to the Entity List. *See* Authorization To Impose License Requirements for Exports or Reexports to Entities Acting Contrary to the National Security or Foreign Policy Interests of the United States, 73 Fed. Reg. 49311, 49312 (Aug. 21, 2008).  This final rule also defined the procedures governing decisions about Entity List additions and removals, codifying them at Supplement No. 5 to Part 744 of the EAR (hereinafter, "Supplement No. 5").  *See* 73 Fed. Reg. at 49313, 49322-23.

58.     When promulgating this 2008 final rule, BIS considered a public comment which expressed concern that Entity List decision-making might be vulnerable to "capricious interagency behavior" or might be exploited for "commercial mischief."  *See* 73 Fed. Reg. at 49316.  BIS responded that 15 C.F.R. § 744.11(b)'s standards and Supplement No. 5's procedures, *inter alia*, "provide reasonable safeguards against capricious interagency behavior."  *Id.*

59.     At all relevant times, 15 C.F.R. § 744.11(b) has provided that an entity (and those acting on its behalf) may be added to the Entity List if there is "reasonable cause to believe, based on specific and articulable facts," that the entity "has been involved, is involved, or poses a

significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States ....”

60.     At all relevant times, 15 C.F.R. § 744.11(b) has also identified “an illustrative list of activities that could be contrary to the national security or foreign policy interests of the United States,” relating to support for terrorism, dealings related to conventional weapons, the prevention of BIS “end-use check” site visits, and “[e]ngaging in” unspecified “conduct that poses a risk of violating the EAR when such conduct raises sufficient concern” for the ERC.  *See* 15 C.F.R. § 744.11(b)(1)-(5).  All of these illustrative examples concern *conduct* by the potentially listed entity itself, except for one example (which BIS added in October 2022) concerning the prevention of a BIS site visit by the foreign government that hosts the potentially listed entity.

61.     At all relevant times, 15 C.F.R. § 744.11 has provided that the ERC “will follow the procedures set forth in” Supplement No. 5.

62.     Supplement No. 5 provides that the ERC “will make all decisions to make additions to, removals from or changes to the Entity List ….”  15 C.F.R. pt. 744, Suppl. No. 5.  Supplement No. 5 also provides that the Committee will be chaired by the Department of Commerce and composed of representatives of the Departments of Commerce, State, Defense, Energy and, where appropriate, Treasury.  *Id.*  It further provides that the Committee “will make all decisions to add an entry to the Entity List … by majority vote,” and that it will make all decisions to remove or modify an entry by unanimous vote.  *Id.*

63.     Supplement No. 5 does not empower any individual member agency or group of member agencies to add an entity to the Entity List without going through the ERC process. Instead, Supplement No. 5 provides that “[a]ny agency that participates in the ERC may make a proposal for an addition to, modification of, or removal of an entry from the Entity List,” which

the agency is to do "by submitting that proposal to the chairperson." *Id.* Supplement No. 5 then requires the ERC chair to circulate proposals to add, remove, or modify an Entity List entry to all member agencies for consideration and a vote by the Committee. *See id.*

64.    Supplement No. 5 establishes an internal escalation process in the event of inter-agency disagreement. If a member agency is not satisfied with the outcome of the ERC's vote, the agency may escalate the matter to the Advisory Committee on Export Policy ("ACEP"). *Id.* A member agency that is not satisfied with ACEP's decision may escalate the matter to the Export Administration Review Board ("EARB"). *Id.* Finally, a member agency that is not satisfied with the decision of the EARB may escalate the matter to the President of the United States. *Id.*

65.    Supplement No. 5 clarifies that although the ERC's decision to add a party to the Entity List must be made by majority vote, the decision need not be unanimous. *See id.*

66.    It is harder to get removed from the Entity List than it is to be placed on it. A listed entity can request removal, but the Committee can grant removal only by a unanimous vote, rather than by a simple majority vote. *See* 15 C.F.R. § 744.16(e); 15 C.F.R. pt. 744, Suppl. No. 5.

67.    When ECRA was enacted in 2018, Congress included a transitional provision requiring that all EAR-related "delegations, rules, regulations, and other forms of administrative action" in place before ECRA's passage "shall continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of [ECRA]." 50 U.S.C. § 4826(a). As the D.C. Circuit has explained, this provision "statutorily endorsed those preexisting regulations" and related actions, "explicitly preserving [them] in law[.]" *Federal Express v. U.S. Dep't of Commerce*, 39 F.4th 756, 760 (D.C. Cir. 2022).

68.    Supplement No. 5's requirement that only the ERC, acting by majority vote, may add parties to the Entity List, as well as 15 C.F.R. § 744.11(b)'s "specific and articulable facts"

standard governing additions to the Entity List, both preceded ECRA's enactment.  Defendants have never revised the relevant portions of these provisions.  Defendants are therefore bound by Congress's command that these regulations "shall continue in effect according to their terms."  *See* 50 U.S.C. § 4826(a).

## III.    **The Government's Determination to Add YMTC and YMTJ to the Entity List**

69.    The process by which YMTC and YMTJ were added to the Entity List was unlawful because, *inter alia*, according to the public record, "the ERC" did not make the determination to add them to the Entity List.  Instead, unspecified "agencies represented on the ERC," rather than the Committee itself acting as a body, made that determination.  *See* 87 Fed. Reg. at 77506.  On information and belief, that determination did not comply with the ERC's procedures required by Supplement No. 5.

70.    The process by which YMTC and YMTJ were added to the Entity List was also unlawful because, on information and belief, personnel outside the ERC and Commerce Department—including personnel in the Biden administration's Executive Office of the President ("EOP")—predetermined that YMTC and YMTJ should be added to the Entity List, and then imposed that decision upon the ERC, which thereafter failed to exercise its delegated discretion to make determinations about Entity List additions.

71.    On information and belief, the predetermination that YMTC should be added to the Entity List rested on misinformation disseminated directly or indirectly by persons associated with U.S. competitors of YMTC, including a U.S.-based memory and storage technology company ("Company A").

72.    According to Lobbying Disclosure Act filings by one of Company A's registered lobbying firms ("Lobbying Firm A"), beginning in late 2019, this firm began actively lobbying the U.S. Congress on Company A's behalf about "[i]ssues related to China and competition practices."

Lobbying Firm A also publicly disclosed that by late 2021, its China-related lobbying for Company A expanded to reach the Executive Office of the President and the Commerce Department. Effective December 31, 2022—just two weeks after YMTC and YMTJ were added to the Entity List—Lobbying Firm A terminated its China-related lobbying registration for Company A.

73.     On information and belief, Company A's lobbying of the Executive Office of the President and the Commerce Department in late 2021 and throughout 2022 included specifically advocating for YMTC's addition to the Entity List. Press reports indicate that in 2022, Company A lobbied for the blocking of exports to YMTC. Press reports also indicate that Company A helped fund a website ("Website A") that, together with its co-founder, has specifically advocated for YMTC's addition to the Entity List, and that Website A is the project of a public affairs firm with a history of "astroturfing" (the technique of disguising corporate messaging as grassroots advocacy). Beginning no later than October 2020 and lasting through at least late 2022, Website A and its co-founder published multiple blog posts, press releases, and reports advocating for YMTC's addition to the Entity List, urging U.S. companies to sever or avoid business relationships with YMTC, and inaccurately suggesting that YMTC made sales to Huawei in violation of U.S. export controls.

## A.     The Campaign to Add YMTC to the Entity List

74.     In May 2020, BIS issued an interim rule that created a new "Footnote 1" designation for the Entity List, in order to designate Chinese company Huawei as subject to additional export controls.

75.     In August 2020, BIS issued a final rule that imposed additional restrictions on sales to Huawei of certain foreign-produced items that were not otherwise subject to the EAR. This August 2020 final rule had the effect of restricting YMTC's sales to Huawei for the first time.

However, these restrictions did not apply to items in production by August 17, 2020, and shipped to Huawei by September 14, 2020.

76.    Following BIS's issuance of its August 2020 final rule, YMTC ended all sales of its chips to Huawei in compliance with the deadlines imposed by that rule.

77.    On November 21, 2020, Website A's co-founder jointly authored an editorial stating that the U.S. government "needs to add" YMTC to the Entity List.

78.    Four days later, on November 25, 2020, BIS's Office of Export Enforcement ("OEE") contacted YMTC with a request that YMTC demonstrate its compliance with the August 2020 final rule regarding sales to Huawei, including by producing various business records and detailed product information.  Eight days after OEE's request, YMTC (through counsel) provided the information.  Over the next three months, BIS sought additional information about YMTC's methodology for tracking individual items that it produces and ships.  YMTC provided all requested information by February 2021.  BIS did not respond further.

79.    In July 2021, Website A and its co-founder again attacked YMTC in a press release about the confirmation hearing for President Biden's nominee to head BIS, stating that "[w]e expect the members of [the relevant Senate committee] to ask [the nominee] … whether BIS will move quickly to restrict" YMTC.

80.    Beginning in July, August, or September 2021, Lobbying Firm A began actively lobbying the EOP and Commerce Department on Company A's behalf (in addition to its lobbying of Congress, *see supra* ¶ 72) on issues related to China and competition practices.  On information and belief, this lobbying of EOP and Commerce advocated for, among other things, YMTC's placement on the Entity List.

81.     In March 2022, Website A published a blog post stating that U.S. multinational technology company Apple was considering sourcing NAND flash memory chips from YMTC for use in Apple's iPhone.  The blog post criticized the possibility of an Apple-YMTC relationship and cited an earlier publication by Website A's co-founder that urged YMTC's addition to the Entity List.

82.     Also in March 2022, BIS contacted YMTC's counsel for the first time in over a year and informed him of a non-public report concerning YMTC by industry analysis firm TechInsights.  According to BIS, this TechInsights report concerned a Huawei smartphone that supposedly contained a YMTC memory package.  BIS asked YMTC for information about YMTC's memory components and to explain their alleged inclusion in the Huawei device.  BIS declined YMTC's request to see a copy of the TechInsights report.

83.     YMTC eventually acquired its own copy of this TechInsights report.  The report, published in January 2022, discussed TechInsights' "teardown" of a Huawei smartphone that contained two memory packages: one made by another manufacturer, and one that TechInsights speculated to have been manufactured by YMTC.  In fact, the memory package itself was not manufactured by YMTC but by a different company, Hefei CoreStorage ("CoreStorage"); however, the memory package appeared to include four YMTC memory dies.  Based on the memory package's serial number and manufacture date, YMTC determined that Huawei could have purchased YMTC's chips—whether from YMTC, CoreStorage, or elsewhere on the open market—at a time when selling them to Huawei did not violate U.S. law.

84.     The January 2022 TechInsights report identified other multinational electronics companies whose components were also discovered in the Huawei device, but who are not on the Entity List to this day.

85.     From April 2022 through October 2022, in a vigorous—but, in retrospect, futile—attempt to reassure BIS, YMTC diligently responded to BIS's requests for information and related follow-up questions, again providing BIS with detailed business information.  Among other things, YMTC reiterated that its records confirmed that it made no sales to Huawei after the deadlines imposed by BIS's August 2020 final rule.  YMTC also explained that it recently purchased, on the open market, a Huawei smartphone of the kind analyzed in the January 2022 TechInsights report, and that it found no YMTC components in the phone.  Additionally, around July 11, 2022, BIS requested data for YMTC's sales to CoreStorage, and around July 12, 2022, BIS formally notified YMTC of BIS's concerns that CoreStorage may have engaged in diversion to a party on the Entity List.  YMTC gave BIS a comprehensive list of its sales to CoreStorage.

86.     YMTC first entered its sales relationship with CoreStorage in 2019.  Before commencing this customer relationship, as part of YMTC's Internal Compliance Program, YMTC conducted compliance screening of CoreStorage.  YMTC also required CoreStorage to execute an End-Use Statement which acknowledged that YMTC's products were subject to U.S. export control regulations, and that CoreStorage was committed to handling those products in compliance with U.S. export controls.  From 2019 until BIS shared its questions and concerns about CoreStorage in July 2022, YMTC had no reason to believe that CoreStorage might divert any YMTC chips.

87.     In response to BIS's July 11, 2022 questions about CoreStorage, YMTC requested additional information from CoreStorage, which failed to adequately respond.  And after receiving BIS's July 12, 2022 formal notice of concerns over potential diversion by CoreStorage, YMTC canceled all shipments to CoreStorage, acting consistently with BIS's "Know Your Customer"

Guidance and Red Flags.  *See* 15 C.F.R. pt. 732, Suppl. No. 3.  YMTC has not made any sales to CoreStorage since 2022.

88.    At no point—then or now—did BIS or any other U.S. government agency allege any unlawful conduct by YMTC (or YMTJ).

89.    BIS has never revealed to YMTC who furnished the January 2022 TechInsights report to BIS.  Nevertheless, someone leaked the fact of BIS's receipt of the TechInsights report to the media.

90.    On April 27, 2022, the U.K. newspaper *Financial Times* reported that two unidentified U.S. officials and another individual had confirmed that the Biden White House and BIS had "received" the TechInsights report from an unidentified sender.  The article also quoted an unnamed "U.S. official" as saying that "YMTC seemed to have breached the [Entity List foreign direct product rule] but [that] any decision about punishing [YMTC] would probably be a 'political call.'"

91.    This *Financial Times* article also quoted Website A's co-founder, who had previously criticized the fact that YMTC was not on the Entity List.  The same day, Website A amplified this "leak" by publishing a blog post citing the *Financial Times* report, urging the placement of YMTC on the Entity List, and encouraging "[e]nterprising lawmakers and investigators … to inquire whether American components are going into YMTC chips used for surveillance gear manufactured by Hikvision, another Chinese firm on the Commerce Department's Entity List[.]"

92.    In fact, YMTC has never sold or delivered anything to Hikvision.

**B.    Defendants' Actions Ahead of Adding YMTC and YMTJ to the Entity List**

93.    By letter to BIS dated October 4, 2022, Website A's co-founder urged BIS to add YMTC to the Entity List, stating that it would be justified by YMTC's "apparent relationship" with Huawei.

94.    Three days later, on October 7, 2022, BIS issued a final rule that added YMTC and 30 other unrelated entities to its "Unverified List" ("UVL"), triggering certain restrictions on exports to the newly listed parties. *See* Revisions to the Unverified List; Clarifications to Activities and Criteria That May Lead to Additions to the Entity List, 87 Fed. Reg. 61971 (Oct. 13, 2022). The Unverified List is separate from the Entity List and is used, *inter alia*, to designate companies for whom BIS cannot complete site visits, known as "end-use checks," by which BIS verifies companies' reliability and legitimacy relating to the end-use and end-user of items subject to the EAR.  BIS may add parties to the Unverified List without ERC action.

95.    This final rule also revised 15 C.F.R. § 744.11(b) to state that the ERC may ultimately add a foreign company to the Entity List if its host government's sustained lack of cooperation prevents BIS from completing a site visit.

96.    BIS did not add YMTC to the Unverified List because of YMTC's own conduct. Instead, as BIS later informed YMTC's counsel, YMTC was added because the Chinese government had not yet consented to BIS's request to conduct a site visit of YMTC's Chinese facilities.  At no time did Defendants represent to YMTC that its placement on the Unverified List was for any reason other than BIS's inability to perform a site visit.

97.    Also on October 7, 2022, BIS issued a policy memorandum concerning companies that had just been added to the Unverified List because, *inter alia*, their host governments' actions prevented BIS from completing its site visits.  The memorandum stated that if BIS could not

- 23 -

complete its site visits within 60 days (*i.e.*, by December 6, 2022), BIS would then "initiate" the ERC's deliberative process for adding those companies to the Entity List.

98.    On November 17, 2022, YMTC's counsel informed BIS that YMTC was ready for a site visit.  However, YMTC understood that BIS had objections to the Chinese government's COVID-19 quarantine protocols that would apply to BIS personnel conducting the visit.

99.    In connection with Freedom of Information Act ("FOIA") litigation concerning YMTC's placement on the Entity List, *see Husch Blackwell LLP v. U.S. Dep't of Commerce*, No. 24-CV-2733 (D.D.C.), the Commerce Department and BIS have disclosed heavily redacted emails and attachments, as well as a *Vaughn* index.  On information and belief, these documents concerned YMTC because they were disclosed in connection with a YMTC-specific FOIA request. Despite their many redactions, and as detailed below, these emails reveal that from November 2022 through December 2022, Defendants discussed additions to the Entity List and revised the drafts of related rulemaking, including the December 16, 2022 final rule that placed YMTC on the Entity List.  Several of these discussions included now-former senior National Security Council ("NSC") policy officials in the Biden administration's Executive Office of the President.  On information and belief, the level and degree of NSC participation in YMTC's addition on the Entity List was atypical for the ERC's deliberations about such additions.

100.    On Monday, November 28, 2022, an NSC official called but did not reach an ERC official.  Soon after, the NSC official emailed that ERC official, as well as the ERC chair and two BIS officials, to request a "list" for discussion at an upcoming November 30 "small group" meeting concerning upcoming Entity List rulemaking.

101.    On Tuesday, November 29, 2022, BIS successfully conducted its end-use site visit at YMTC's facilities in China.  YMTC cooperated fully with the site visit.

- 24 -

102.    On information and belief, as of at least November 29, 2022, there was no decision to place YMTC and YMTJ on the Entity List.  If that decision had already been made, and if it were based on the ground that BIS had not yet completed its site visit of YMTC in China, this would have contradicted BIS's October 7, 2022 policy memorandum, which gave YMTC until December 6, 2022 for BIS to complete its site visit *before* it would initiate the ERC's Entity List deliberations.  *See supra* ¶ 97.  And if the decision to place YMTC and YMTJ on the Entity List had already been made for reasons unrelated to BIS's inability to complete a site visit, this would have mooted the imminent need for such a visit, which in turn would mean that YMTC was misled about BIS's need for a visit in the first place.

103.    Also on Tuesday, November 29, 2022, the NSC official noted above (*see supra* ¶ 100) emailed BIS to repeat his request for Commerce's "list" ahead of the November 30 "small group" meeting.  BIS sent it a few hours later.

104.    On Wednesday, November 30, 2022, on information and belief, officials from BIS and NSC attended the "small group" meeting concerning BIS's upcoming Entity List rulemaking.

105.    On Thursday, December 1, 2022, a BIS official emailed several Commerce and BIS officials to note that he was developing a schedule for the December 16 publication of a semiconductor-related Entity List rule.  This email also asked: "What will be the ERC voting deadline?"  On information and belief, this semiconductor-related rule was part of the December 16, 2022 final rule that placed YMTC and YMTJ on the Entity List.

106.    Several hours later that same day, Thursday, December 1, 2022, another BIS official emailed the NSC's Director of Technology and National Security and five other NSC officials, explaining the status of Entity List rulemaking following the November 30 meeting.  In particular, this BIS official noted the goal of issuing an Entity List final rule on December 16, and

the need for the rule's contents to be "locked down" on December 2 in order to meet the Federal Register publication timeline.  Later that night of December 1, NSC officials responded with comments and asked to schedule a videoconference with BIS officials the next morning.

107.    On Friday, December 2, 2022 at around 9:30 a.m., on information and belief, NSC officials and BIS officials participated in a videoconference regarding additions to the Entity List.

108.    On Sunday, December 4, 2022, a BIS official emailed several Commerce and BIS officials to state that he "finished updating" the Entity List rule.

109.    On Monday, December 5, 2022 at 1:04 p.m., that same BIS official circulated a draft of rule 0694-AJ04, which ultimately became the December 2022 Final Rule, to Commerce and BIS officials "for expedited BIS and OCC [Office of the Chief Counsel] review."  He requested all comments no later than 5 p.m. that same day, stating: "We are under an extremely tight deadline on this, so [I] apologize for the tight turnaround, but this is all the time we have to work with on it for the BIS and OCC review until we need to move to the next step."

110.    During the week of December 5, 2022, Commerce and BIS officials continued to revise and finalize what ultimately became the December 2022 Final Rule.

### C.    The Placement of YMTC and YMTJ on the Entity List

111.    On or around December 15, 2022, BIS issued the December 2022 Final Rule that added YMTC, YMTJ, and 34 other Chinese entities to the Entity List, effective December 16.  The Final Rule was published in the Federal Register on December 19, 2022.  *See* Additions and Revisions to the Entity List and Conforming Removal From the Unverified List, 87 Fed. Reg. 77505 (Dec. 19, 2022).

112.    Plaintiffs did not receive advance notice or an advance opportunity to be heard about the additions of YMTC and YMTJ to the Entity List.

113.    The prescribed process for adding a party to the Entity List begins with an ERC member agency submitting a proposal to the ERC chair.  *See* 15 C.F.R. pt. 744, Suppl. No. 5; *supra* ¶ 63.  Plaintiffs have never seen or been given access to any such proposals (or related memoranda or supporting documents), despite requesting them from Defendants on multiple occasions.

114.    The December 2022 Final Rule stated in relevant part:

> ***The agencies represented on the ERC determined*** to add [YMTC, YMTJ, and CoreStorage] … to the Entity List for posing a significant risk of becoming involved in activities contrary to the national security or foreign policy interests of the United States. ***This request*** is based on information indicating that these companies present a risk of diversion to parties on the Entity List, to include Huawei Technologies Co., Ltd., and Hangzhou Hikvision Digital Technology Co., Ltd. ***This activity*** is contrary to the national security or foreign policy interests of the United States under § 744.11(b) of the EAR.

87 Fed. Reg. at 77506 (emphases added).

115.    The Final Rule added YMTC and YMTJ to the Entity List with a license requirement for all items subject to the EAR and a license review policy of "presumption of denial" for all items subject to the EAR.  87 Fed. Reg. at 77506.

116.    The Final Rule also moved YMTC off the Unverified List, noting that its placement on the Entity List was *not* related to any prevention of a site visit.  87 Fed. Reg. at 77508.

117.    Effective December 31, 2022, two weeks after YMTC and YMTJ were added to the Entity List, Lobbying Firm A terminated its federal lobbying registration for Company A concerning China and competition practices.

D.    **Anomalies in the Addition of YMTC and YMTJ to the Entity List**

118.    The December 2022 Final Rule contained anomalous explanations for why YMTC and YMTJ were added to the Entity List.

119.    Pursuant to Supplement No. 5, the prescribed process for making Entity List additions is for an ERC member agency to submit a "proposal" to the ERC chair, who then circulates the proposal to the other member agencies for a vote within 30 days (absent a unanimous decision to postpone the vote). *See* 15 C.F.R. pt. 744, Suppl. No. 5; *supra* ¶ 63. If a majority of ERC member agencies agrees to add a party, the ERC decides—as a committee—to make that addition, and a decision is published in the Federal Register.

120.    The addition of YMTC and YMTJ to the Entity List was anomalous in at least three ways.

121.    ***First***, the December 2022 Final Rule was procedurally anomalous because the ERC did not determine to add YMTC or YMTJ to the Entity List. The December 2022 Final Rule departed from standard practice in how it described the determination to add YMTC and YMTJ (and CoreStorage) to the Entity List. For the *other* 33 listed entities, the Final Rule stated that "the ERC determined to add" the entity. *See, e.g.*, 87 Fed. Reg. at 77506-07. BIS has also consistently used the phrase "the ERC" in prior (and subsequent) rulemakings when identifying the body that determined to add a party to the Entity List. When it came to YMTC and YMTJ (and CoreStorage), however, the Final Rule deviated from this phrasing and stated only that "the agencies represented on the ERC determined to add" these companies. *Id.* at 77506. BIS did not use the phrase "the agencies represented on the ERC determined" anywhere else in the Final Rule.

122.    On information and belief, BIS's use of the phrase "the agencies represented on the ERC determined" as applied to YMTC and YMTJ (rather than the phrase "the ERC determined") reflected an intentional and material choice.

- 28 -

123.    **Second**, the December 2022 Final Rule was procedurally anomalous also because it stated that YMTC and YMTJ (and CoreStorage) were added to the Entity List based on an unspecified "request."  *See* 87 Fed. Reg. at 77506.  BIS did not use the word "request" anywhere else in the Final Rule (except as part of an unrelated email address for public questions), and none of BIS's other rulemakings appear to reference a "request" to add a party to the Entity List.

124.    On information and belief, BIS's use of the word "request" as applied to YMTC and YMTJ reflected an intentional and material choice.  On information and belief, the December 2022 Final Rule's "request" to add YMTC and YMTJ improperly originated outside the ERC.

125.    **Third**, the December 2022 Final Rule was substantively anomalous because it did not identify any "activity" by YMTC or YMTJ as the grounds for their addition to the Entity List, despite citing "[t]his activity" as supposedly contrary to U.S. national security or foreign interests under 15 C.F.R. § 744.11(b).  *See* 87 Fed. Reg. at 77506.  Instead, the Final Rule stated only that YMTC and YMTJ (and CoreStorage) allegedly "present[ed] a risk of diversion" of export-controlled items to Huawei and Hikvision, without citing any conduct by YMTC and YMTJ as a basis for the alleged "risk of diversion."  By contrast, for all 33 other newly listed entities, the Final Rule cited conduct attributable to those parties, with various degrees of detail.  *See id.* at 77506-07 (adding entities for allegedly, *inter alia*, "acquiring and attempting to acquire U.S.-origin items in support of China's military modernization," "facilitat[ing] the illegal export of U.S.-origin electronics," or "enabl[ing] the procurement of U.S.-origin items for use by the Islamic Revolutionary Guard Corps").  Even for one entity that was added for allegedly "represent[ing] a risk of diversion to a party on the [] Entity List," the Final Rule explicitly alleged that "[t]he ERC determined that [the entity's] *conduct*" raised concerns warranting its addition.  *Id.* at 77506 (emphasis added).  By contrast, the Final Rule did not cite any "conduct" by YMTC or YMTJ.

126.    On information and belief, BIS's omission of any reference to conduct by YMTC and YMTJ reflected an intentional and material choice.

127.    The December 2022 Final Rule stated that YMTC and YMTJ were added to the Entity List based on purported "information indicating" that they "present a risk of diversion to" Huawei and Hikvision.  87 Fed. Reg. at 77506.  With regard to Huawei, YMTC ended sales and shipments to Huawei in late 2020, in compliance with BIS's August 2020 foreign direct product rule concerning Huawei (*see supra* ¶ 75).  YMTC's prior sales to Huawei were compliant with U.S. export controls at the time they were made.  YMTC explained all of this to BIS long before the December 2022 Final Rule.  With regard to Hikvision, YMTC's business records reflect no sales or deliveries by YMTC (or YMTJ) of its products to Hikvision.  Regardless, BIS has not applied the Entity List's foreign-direct product rules to Hikvision, so then and now, any hypothetical sales of YMTC chips to Hikvision would not violate U.S. export controls applicable to Hikvision.

## IV.    Requests by YMTC and YMTJ for Removal from the Entity List

128.    In the three years since YMTC and YMTJ were added to the Entity List, they have diligently sought their removal through written submissions and numerous discussions and meetings with Defendants and other agencies represented on the ERC.  Throughout these discussions, no agency ever acknowledged that it had advocated for placing YMTC or YMTJ on the Entity List.

129.    Across these efforts, YMTC has repeatedly explained its historical and ongoing commitment to export control compliance and addressed the factually erroneous stated bases for the December 2022 Final Rule's Entity List determinations.  YMTC has also repeatedly asked what it did (or failed to do) in order to warrant being placed on the Entity List, and what it must do in order to be removed from the Entity List.

130.    Defendants have never cited or alleged any unlawful conduct by YMTC or YMTJ, never provided any guidance about what YMTC and YMTJ could have done differently to avoid placement on the Entity List, and never identified what assurances from YMTC and YMTJ would be necessary to establish that they pose no risk of diversion today.

131.    Senior BIS officials first agreed to meet with YMTC's representatives in October 2023, ten months after YMTC and YMTJ were listed.   At this October 2023 meeting, BIS represented that the reason for the Entity List placement was that YMTC's products had been found in a Huawei device.  (BIS did not cite Hikvision as a basis for the listings.)  YMTC reiterated its compliance with U.S. export controls when selling its products to its customers.  BIS never cited any unlawful conduct by YMTC or YMTJ.

132.    In March 2024, YMTC's representatives met again with BIS officials.  YMTC gave a detailed presentation about why it posed no risk of diversion and why the December 2022 Final Rule's stated bases for the listing were erroneous.   YMTC again asked BIS to explain the government's concerns that resulted in its listing.  YMTC also offered to confer with members of the ERC to establish a dialogue and respond to any other concerns BIS or any other the government agency may have.  YMTC received none of the guidance that it requested about why it was listed.

133.    In April 2024, YMTC's representatives spoke with leadership in BIS's Office of Export Enforcement and an official in BIS's Office of Chief Counsel.  OEE made clear that it had not nominated YMTC for inclusion on the Entity List.  One official noted that once YMTC submitted a formal request for removal from the Entity List, BIS's Office of Export Administration could engage in a dialogue with YMTC about removal.

134.    On June 26, 2024, YMTC and YMTJ submitted requests to the ERC for removal from the Entity List, pursuant to 15 C.F.R. § 744.16(e) and Supplement No. 5.

135.    YMTC's removal request stated that it had analyzed its business records and found no evidence of any transactions that violated the EAR; that its internal investigation and external audit had found no evidence of any unlawful transactions or diversion; and that there were no other legal or factual bases for the assertion that YMTC presented a "risk of diversion" to Huawei or Hikvision.  YMTC's removal request also stated that it had complied with BIS's numerous requests for voluminous business records; that the government had never conveyed any allegation of unlawful conduct by YMTC; and that the facts available to YMTC showed that, at all times, YMTC had fully and faithfully complied with the EAR and cooperated with U.S. authorities.

136.    YMTJ's removal request stated its belief that it was added to the Entity List based solely on its relationship with YMTC.  Accordingly, YMTJ's request attached and incorporated YMTC's removal request.

137.    In October 2024, YMTC's representatives met with the ERC chair and other Commerce officials about the removal requests.  The ERC chair identified the Departments of State, Defense, and Energy (but not Treasury) as the other relevant agencies for consideration of those requests.  YMTC noted that the Federal Register notice was the only information that it had received about why it was placed on the Entity List, and it requested the specific ERC memorandum or information packet that supported the listing.  The ERC chair confirmed that the Federal Register publications are typically the only information that a company will receive about the reasons for its placement on the Entity List.

138.    That same day, YMTC's representatives also met with leadership in BIS's Office of Export Enforcement.  OEE posed no questions about YMTC's removal request.

139.    In November 2024, YMTC's representatives spoke again with OEE officials.  In response to several questions, YMTC directed these officials to its prior March 2024 presentation.

140.     In early March 2025, YMTC's representatives met with officials at the Department of Defense about the removal requests.  Officials asked that YMTC submit a "white paper" detailing its export control compliance program.

141.     On April 29, 2025, YMTC's representatives met with officials at the Department of State about the removal requests.  The lead official inquired about the December 2022 Final Rule's reference to Hikvision, indicating that potential diversion of YMTC's products to Hikvision was the State Department's principal concern.  YMTC explained that Hikvision was never YMTC's customer, but that even if it had been, YMTC could lawfully sell to Hikvision even today, because despite Hikvision's placement on the Entity List, it is not subject to any of the Entity List's foreign-direct product rules.

142.     The next day, on April 30, 2025, YMTC's representatives met again with ERC officials about the removal requests.  During the discussion, an official noted that the Entity List should offer an "off-ramp" that acknowledges a listed company's changed behavior and improved compliance with export controls.

143.     The Department of Energy declined YMTC's request for a meeting, indicating that it would consider the views of other ERC member agencies.

144.     In May 2025, YMTC submitted the requested white paper to the ERC.  The white paper detailed YMTC's history of commitment to U.S. export control compliance as well as the comprehensive anti-diversion measures that YMTC has taken, and new measures that it would be willing to implement, in order to satisfy any lingering concerns of the U.S. government and to be removed from the Entity List.

145.     In August 2025, YMTC's representatives met with officials in BIS's Office of Export Administration.  YMTC repeatedly asked, to no avail, for guidance about what it did to

warrant being deemed to present a "risk of diversion," and how it can continue to improve its compliance processes to address that criticism.

146.    In September 2025, YMTC's representatives met with officials in BIS's Office of Export Enforcement.  The lead official stated that OEE would follow up as necessary.

147.    To date, Defendants have not issued any decisions on the removal requests submitted by YMTC and YMTJ.

## V.    **The Listed Plaintiffs' Freedom of Information Act Requests**

148.    To understand Defendants' reasons and process for adding YMTC and YMTJ to the Entity List, YMTC and YMTJ jointly submitted two identical FOIA requests on August 1, 2025: one to BIS's FOIA office and one to the Commerce Department's FOIA office.

149.    Commerce and BIS never provided any response to those FOIA requests within (or even after) the statutorily required 20 working days, other than emails acknowledging receipt of and assigning tracking numbers to the requests.

150.    Therefore, YMTC and YMTJ sued the Commerce Department and BIS in this Court on September 3, 2025, seeking judicial intervention to compel Defendants' compliance with their obligations under FOIA.  *See* Complaint, *YMTC v. Dep't of Commerce*, No. 25-CV-2997 (D.D.C. Sept. 3, 2025) (ECF No. 1).

151.    Commerce and BIS have not yet answered that FOIA complaint.

## VI.    **Harm to Plaintiffs**

152.    Defendants' placement of YMTC and YMTJ on the Entity List has caused Plaintiffs severe and irreparable harms.  These harms are ongoing and growing.  Plaintiffs will continue to suffer from these harms unless and until Defendants remove YMTC and YMTJ from the Entity List.

153.    YMTC and YMTJ's placement on the Entity List had the immediate legal effect of imposing a license requirement for all exports, reexports, and transfers (in-country) to YMTC and YMTJ of items subject to the EAR.  That effectively means that YMTC and YMTJ may no longer receive *any* U.S. items (sensitive or not) subject to the EAR, unless the exporter or transferor procures a license from BIS.  As noted, such license applications are subject to a presumption of denial for all items subject to the EAR.  *See supra* ¶ 115.

154.    Because the EAR has an extremely broad reach and certain EAR classification rules are not well defined, some companies opt to take a conservative approach to compliance, erring on the side of assuming that an item is controlled and therefore governed by the Entity List's restrictions.

155.    YMTC's addition to the Entity List thus made it unlawful for its U.S. suppliers to honor their contracts with YMTC unless they obtained a license, which Defendants would presumptively deny.  Contracting with alternative U.S. suppliers is not an option for the same reason.

156.    As a result, YMTC has been deprived of critical tools and technology necessary for the development and manufacturing of its 3D NAND products, as well as its property interest in its preexisting contractual relationships with U.S. suppliers.  YMTC has also been deprived of its liberty interest in contracting with new U.S. suppliers.

157.    The Entity List restrictions have also led multinational equipment manufacturers and vendors to stop servicing the equipment at YMTC's chip-fabrication site in China, leaving the company unable to rely on outside assistance with installation, calibration, and maintenance.

158.    YMTC's inability to source critical parts, tools, and technology has prevented it from building new production lines, thereby depriving YMTC of its liberty interest in continuing to pursue and grow its chosen business.

159.    Further, because of YMTC's placement on the Entity List, numerous customers have been forced to end their business with YMTC, costing YMTC millions in lost revenue.

160.    Because of its placement on the Entity List, YMTC cannot secure new U.S. business relationships (even ones in which YMTC is the supplier) that involve the transmission of controlled data to YMTC, which would require a BIS license.

161.    The stigma associated with YMTC and YMTJ's placement on the Entity List has also caused incalculable reputational damage to Plaintiffs, both in the United States and abroad. Because of YMTC's placement on the Entity List, multiple U.S. tech companies declined to collaborate with YMTC to sell U.S. products in the global marketplace. YMTC has also been told that many companies now view YMTC as a "bad actor" and have been unwilling to purchase items from YMTC, even in transactions outside the purview of the EAR.

162.    Defendant Commerce Department, through the Director of the U.S. Patent and Trademark Office ("PTO"), has also invoked YMTC's Entity List placement as a potential basis for refusing to act on a matter unrelated to export controls. Specifically, the Director recently cited YMTC's Entity List placement as potential grounds to reverse the institution of *inter partes* review in two patent cases currently pending before the PTO—a forum and subject matter far outside BIS's jurisdiction.

163.    As a result of YMTJ's own placement on the Entity List as well as its corporate parent YMTC's listing, YMTJ has lost a significant number of prospective and existing sales

contracts.   Many prospective and preexisting customers have gone so far as to cease all communication with YMTJ.

164.    As a U.S. company, YMTI itself has not been added to the Entity List, but it has been treated as though it, too, was on it.  YMTC's placement on the Entity List has made it nearly impossible for YMTI to carry out its business operations.

165.    Without a license—which Defendants would presumptively deny—it almost certainly would be unlawful for YMTI to provide YMTC, its corporate parent, with any U.S. technology or technical information subject to the EAR.  It is also unlawful for YMTI to "cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited" by the export control laws.  50 U.S.C. § 4819(a)(2)(B).  If YMTI were to continue its preexisting business operations with its parent YMTC, therefore, it would risk criminal and civil penalties.  *See id.* § 4819(b)-(c).

166.    YMTI has also lost major prospective customers, which has deprived it of substantial revenues.  The stigma on YMTI even caused YMTI's longtime bank in California to sever its relationship with YMTI, which it did due to concerns about YMTC's Entity List listing, even though (a) the listing does not currently bar any U.S. financial institution from serving YMTI; and (b) YMTI used the account simply to manage its operational expenses, including the few remaining employees' salaries and basic utilities.

167.    YMTI has been forced to drastically scale back its U.S. operations.  It has downsized its office space and laid off engineers and other employees, leaving fewer than a dozen U.S. employees today that sustain a minimal U.S. presence necessary to carry out YMTI's basic corporate functions.

## COUNT I

### *Ultra Vires* Agency Action
### (Violation of ECRA-Ratified Entity List Procedures)

168.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

169.    Defendants acted *ultra vires* when adding YMTC and YMTJ to the Entity List because, on information and belief, they violated the mandatory procedures for such additions that Congress expressly ratified.

170.    Supplement No. 5 identifies mandatory procedures governing additions to the Entity List.  These procedures include the requirement that the ERC "will make all decisions to make additions to … the Entity List," and that it "will make all [such] decisions … by majority vote" on "proposals" circulated by the ERC chair among the Committee's member agencies. 15 C.F.R. pt. 744, Suppl. No. 5.

171.    Supplement No. 5 does not empower any individual member agency or group of member agencies to add an entity to the Entity List.  Instead, Supplement No. 5 provides that ERC member agencies may make "proposals" for additions, upon which the Committee must deliberate.

172.    Congress statutorily endorsed these procedures when enacting ECRA in 2018, *see* 50 U.S.C. § 4826(a); *supra* ¶ 67, explicitly preserving Supplement No. 5's procedures in law and requiring that Defendants give those procedures continued effect unless and until Defendants modify them through appropriate channels, which Defendants have not done.

173.    On information and belief, Defendants violated one or more of Supplement No. 5's requirements.

174.    As reflected in the December 2022 Final Rule, the ERC did not make the determination to add YMTC and YMTJ (and CoreStorage) to the Entity List.  Instead, "the

agencies represented on the ERC" made that determination based on an unspecified "request."  87 Fed. Reg. at 77506.  In the Final Rule, Defendants did not use such language when describing any other addition to the Entity List.  Even in other Entity List rulemakings, on information and belief, Defendants have not stated that they added a party to the Entity List based on a "request." Additionally, on information and belief, the December 2022 Final Rule is the only time that an Entity List rulemaking has stated *only* that "[t]he agencies represented on the ERC determined" to add a party to the Entity List without simultaneously stating that the ERC, as a body, also determined to add that party.

175.    On information and belief, the unspecified "agencies represented on the ERC" who determined to place YMTC and YMTJ on the Entity List acted outside the ERC's procedures required by Supplement No. 5.

176.    On information and belief, the determination to place YMTC and YMTJ on the Entity List improperly originated from a "request" by another entity or individual outside the ERC.

177.    On information and belief, the decision to list YMTC and YMTJ was not a genuine product of the ERC's deliberation and escalation procedures required by Supplement No. 5, but was instead predetermined outside the ERC as a "political call" (*see supra* ¶ 90).  The ERC thus failed to exercise the discretion that BIS regulations required it to exercise.

178.    Defendants therefore acted in excess of their delegated powers, as set forth in Supplement No. 5, and in violation of the mandatory requirements of ECRA's transitional provision, by which Congress commanded that Supplement No. 5's procedures, unless lawfully modified, "shall continue in effect according to their terms."  50 U.S.C. § 4826(a).

179.    Defendants' unlawful acts have caused, are causing, and will continue to cause harm to Plaintiffs.

<u>**COUNT II**</u>

**Violation of Due Process and Federal Common Law – *Accardi***
**(Violation of ECRA-Ratified Entity List Procedures)**

180.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

181.    To the detriment of all Plaintiffs, Defendants added YMTC and YMTJ to the Entity List in violation of BIS's Entity List regulatory procedures and criteria, thereby violating the rule-of-law principles articulated in *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (vacating a deportation order issued in violation of regulatory procedures), and its progeny.  *See, e.g.*, *Service v. Dulles*, 354 U. S. 363, 388 (1957); *Vitarelli v. Seaton*, 359 U. S. 535, 545 (1959); *Yellin v. United States*, 374 U.S. 109, 123-124 (1963).   This, in turn, violated the Fifth Amendment's Due Process Clause and federal common law.

182.    Under *Accardi* and its progeny, federal agencies and their officials must follow their own rules and regulations, even self-imposed procedural rules that limit otherwise discretionary decisions, particularly where those provisions provide the only safeguard that private parties have against unconstrained agency discretion.  As this Court and others have recognized, *Accardi*'s rule-of-law principles may be enforced through substantive due process claims as well as standalone claims, independently of the Administrative Procedure Act.

183.    On information and belief, Defendants violated one or more of Supplement No. 5's requirements.

184.    YMTC is entitled to the process due under the U.S. Constitution because of its substantial connections with the United States.  YMTI is so entitled because it is a U.S. entity.

185.    As reflected in the December 2022 Final Rule, the ERC did not make the determination to add YMTC and YMTJ (and CoreStorage) to the Entity List.  "[T]he agencies

represented on the ERC" made that determination based on an unspecified "request."  87 Fed. Reg. at 77506.  In the Final Rule, Defendants did not use such language when describing any other addition to the Entity List.  Even in other Entity List rulemakings, on information and belief, Defendants have not stated that they added a party to the Entity List based on a "request."  Additionally, on information and belief, the December 2022 Final Rule is the only time that an Entity List rulemaking has stated *only* that "[t]he agencies represented on the ERC determined" to add a party to the Entity List without simultaneously stating that the ERC, as a body, also determined to add that party.

186.    On information and belief, the unspecified "agencies represented on the ERC" who determined to place YMTC and YMTJ on the Entity List acted outside the ERC's procedures required by Supplement No. 5.

187.    On information and belief, the determination to place YMTC and YMTJ on the Entity List improperly originated from a "request" by another entity or individual outside the ERC.

188.    On information and belief, the decision to list YMTC and YMTJ was not a genuine product of the ERC's deliberation and escalation procedures required by Supplement No. 5, but instead was predetermined outside the ERC as a "political call" (*see supra* ¶ 90).  The ERC thus failed to exercise the discretion that BIS regulations required it to exercise.

189.    On information and belief, Defendants also violated 15 C.F.R. § 744.11(b)'s requirement that parties be added to the Entity List only if there is "reasonable cause to believe, based on specific and articulable facts," that the party "has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States."  For almost three years, Defendants have declined to articulate any such facts to YMTC and YMTJ.

190.    Supplement No. 5's procedures and 15 C.F.R. § 744.11(b)'s criteria protect private parties as well as the government's own interests by helping "provide reasonable safeguards against capricious interagency behavior," *see* 73 Fed. Reg. at 49316, and promoting "consisten[cy] with the [Entity List] criteria set forth in [15 C.F.R.] § 744.11," *see id.* at 49318.

191.    Defendants' unlawful acts have caused, are causing, and will continue to cause harm to Plaintiffs.  Defendants' violations of agency regulations have also substantially prejudiced Plaintiffs by depriving them of these safeguards against agency caprice and inconsistency.

## COUNT III

### *Ultra Vires* Agency Action
### (Violation of ECRA's Entity List Criteria)

192.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

193.    Defendants also acted *ultra vires* in adding YMTC and YMTJ to the Entity List on vague "risk of diversion" grounds, not grounded in any conduct and unmoored from Congress's narrow statutory criteria.

194.    Section 4811(2)(A) of Title 50 of the U.S. Code provides that "[t]he national security and foreign policy of the United States require" controlling "the release of items" subject to the EAR for use in five specific areas: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."

195. Defendants have never alleged (and on information and belief, have never found) that any Plaintiff engaged in any of the activities enumerated in Section 4811(2)(A)—with or without items subject to the EAR.

196. Defendants have never alleged (and, on information and belief, have never found) that any Plaintiff aided or abetted third parties engaged in activities enumerated in Section 4811(2)(A)—with or without items subject to the EAR.

197. Instead, Defendants placed YMTC and YMTJ on the Entity List based on purported "information indicating that" they "present a risk of diversion to parties on the Entity List, to include Huawei Technologies Co., Ltd., and Hangzhou Hikvision Digital Technology Co., Ltd." 87 Fed. Reg. at 77506.

198. In other words, Defendants did not add YMTC and YMTJ to the Entity List because YMTC or YMTJ *themselves* engaged in any particular conduct.

199. Rather, on information and belief, the December 2022 Final Rule's assertion that YMTC and YMTJ "present[ed] a risk of diversion" was based solely on the hypothetical risk that YMTC's downstream customers could potentially divert YMTC's products despite YMTC's robust compliance efforts—a hypothetical risk that exists for every memory chip producer, as reflected by the January 2022 TechInsights teardown report on the Huawei smartphone, which noted the presence of multiple multinational manufacturers' components in that particular device.

200. A generic "risk of diversion"—let alone a generic "risk of diversion" based on no cited conduct—is not among the grounds enumerated in Section 4811(2)(A).

201. The authority conferred on the Secretary in Section 4813(a)(16) to "undertake any other action as is necessary to carry out this subchapter that is not otherwise prohibited by law"

does not encompass adding entities to the Entity List based on a generic risk of diversion to certain parties on the Entity List, for reasons other than those enumerated in Section 4811(2)(A).

202.    Accordingly, Defendants acted *ultra vires* in adding YMTC and YMTJ to the Entity List.

203.    Defendants' unlawful acts have caused, are causing, and will continue to cause harm to Plaintiffs.

**COUNT IV**

**Violation of Non-Delegation Doctrine**

204.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

205.    The U.S. Constitution vests Congress with "[a]ll legislative powers."  U.S. Const. art. I, § 1.

206.    Congress may grant legislative power to an agency only if it provides an "intelligible principle" by which the agency can exercise that power. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

207.    Upon information and belief, Defendants listed YMTC and YMTJ in reliance on purported statutory authority from 50 U.S.C. § 4813(a)(16), which grants the Commerce Department discretion to "undertake any other action as is necessary to carry out" export control "that is not otherwise prohibited by law."

208.    Congress failed to provide any guidance or intelligible principle whatsoever for how the Commerce Department (or its delegees) should exercise the discretion Congress conferred on it in Section 4813(a)(16).

209.    Defendants thus have unfettered discretion under Section 4813(a)(16) to make listing decisions based on *any* conduct they deem objectionable.

210.    Congress's delegation to the Commerce Department of authority to add entities to the Entity List, unconstrained by an intelligible principle, violates Article I of the U.S. Constitution.

211.    Defendants' unlawful acts taken pursuant to Section 4813(a)(16) have caused, are causing, and will continue to cause harm to Plaintiffs.

## COUNT V
### Violation of Due Process – Void for Vagueness
### (by Plaintiff YMTC)

212.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

213.    Both on its face and as applied to YMTC and YMTJ, 15 C.F.R. § 744.11(b)(5)—Defendants' asserted basis for listing YMTC and YMTJ—is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment, because it fails to provide fair notice of the conduct it purports to prohibit, and it fails to limit enforcement discretion, allowing for arbitrary and discriminatory application.

214.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

215.    The Due Process Clause "promise[s] that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.'" *Bittner v. United States*, 598 U.S. 85, 102 (2023) (joint op. of Gorsuch and Jackson, JJ.) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second,

precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253.

216.    YMTC is entitled to the process due under the U.S. Constitution because of its substantial connections with the United States.

217.    A reasonable actor in YMTC's position, seeking to comply with U.S. law when selling products in the open market, would have had no notice that anything it was doing would subject it to the risk of being added to the Entity List.

218.    The December 2022 Final Rule stated that "[t]he agencies represented on the ERC determined to add" YMTC and YMTJ to the Entity List purportedly "based on information indicating that [they] present a risk of diversion to parties on the Entity List, to include [Huawei] and [Hikvision]." 87 Fed. Reg. at 77506.  "This activity," the Final Rule asserted, "is contrary to the national security or foreign policy interests of the United States under [15 C.F.R.] § 744.11(b)," and "[t]he agencies represented on the ERC determined that prior review of exports, reexports, or transfers (in-country) of items subject to the EAR involving these entities, and the possible imposition of license conditions or license denials on shipments to the entity, will enhance BIS's ability to prevent violations of the EAR." *Id.*

219.    This stated rationale is a modified recitation of 15 C.F.R. § 744.11(b)(5), which identifies one of Section 744.11(b)'s "illustrative ... activities" warranting Entity List placement. Subsection (b)(5) concerns "[e]ngaging in conduct that poses a risk of violating the EAR when such conduct raises sufficient concern that the End-User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR."  15 C.F.R. § 744.11(b)(5).

220.    Section 744.11(b)(5) is unconstitutionally vague on its face, because "[the] regulation … is unclear as to what fact must be proved" and thereby fails to give "sufficient notice of what is proscribed." *Fox*, 567 U.S. at 253-54.  Specifically, the relevant statutory and regulatory framework does not define what "conduct" possibly "raises sufficient concern that the End-User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR." *See* 15 C.F.R. § 744.11(b)(5).  Additionally, the phrase "raises sufficient concern" is undefined, subjective, and applied by Defendants through undisclosed criteria.  Nor have Defendants issued any authoritative guidance about what conduct gives rise to an unacceptable risk of EAR violations under this provision.  Without such clear standards, Section 744.11(b)(5) provides no fair warning by which regulated parties can distinguish between conduct that does or does not warrant placement on the Entity List.  It thereby gives no notice to regulated parties about how to conform their conduct to the law, and gives Defendants unfettered discretion to impose severe sanctions through arbitrary and discriminatory application.

221.    Section 744.11(b)(5) is also unconstitutionally vague as applied to YMTC and YMTJ, because it failed to give them fair notice that Defendants could add them to the Entity List for no conduct at all.  Although the December 2022 Final Rule used the phrase "[t]his activity" when listing YMTC and YMTJ, it did not cite any conduct by those parties.  The statutory and regulatory framework does not explain how the absence of conduct (including the absence of culpable inaction, such as inadequate compliance efforts) can amount to "activity" presenting a "risk of diversion."  Similarly, the statutory and regulatory framework does not indicate that *the mere presence* of one company's products (here, YMTC's) in a device manufactured by a second

company on the Entity List (here, Huawei), without any conduct (or culpable inaction) by the first company, would amount to "conduct" that "raises sufficient concern that the End-User Review Committee believes that prior review of exports, reexports, or transfers (in-country) involving the party and the possible imposition of license conditions or license denial enhances BIS's ability to prevent violations of the EAR." *See* 15 C.F.R. § 744.11(b)(5).

222.    The arbitrariness of Defendants' enforcement of Section § 744.11(b)(5) is corroborated by the fact that similarly situated companies were not added to the Entity List (or, on information and belief, otherwise penalized by Defendants) despite the fact that, as Defendants are aware, public sources have stated that those other companies' items (including items made by Company A) were also found in Huawei and/or Hikvision devices.

223.    Defendants' unlawful actions taken pursuant to Section 744.11(b)(5) have caused, are causing, and will continue to cause harm to Plaintiffs, through both the "legal consequence" and "reputational injury" of the placement of YMTC and YMTJ on the Entity List. *See Fox*, 567 U.S. at 255.

<u>**COUNT VI**</u>

**Violation of Due Process – Lack of Notice and Hearing
(by Plaintiffs YMTC and YMTI)**

224.    Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs.

225.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that no person "shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

226.     The fundamental requirement of due process is adequate notice and the opportunity to be heard at a meaningful time and in a meaningful manner when being deprived of property or liberty interests.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

227.     YMTC is entitled to the process due under the U.S. Constitution because of its substantial connections with the United States.  YMTI is so entitled because it is a U.S. entity.

228.     The addition of YMTC and YMTJ to the Entity List, and resulting restrictions on commerce with YMTC and YMTJ, deprived Plaintiffs of their property and liberty interests. These deprivations include, without limitation, (a) YMTC's property interest in the economic viability of its U.S. subsidiary YMTI; (b) YMTC's and YMTI's liberty interests in carrying out and growing their chosen businesses, which YMTC and YMTJ's placement on the Entity List has broadly precluded them from doing; (c) YMTC's and YMTI's liberty interests in contracting with U.S. business partners and property interests in existing contractual relationships with U.S. business partners; and (d) YMTC's and YMTI's liberty interests in their reputations and professional goodwill.

229.     YMTC and YMTI were entitled to due process before they were deprived of these constitutionally protected interests.  That process includes, at a minimum, the right to notice of the basis for Defendants' decision to add YMTC and YMTJ to the Entity List, and a meaningful opportunity to be heard, including an opportunity to rebut whatever evidence Defendants purportedly relied upon when accusing YMTC and YMTJ of "activity" presenting a "risk of diversion."

230.     YMTC and YMTI (as well as YMTJ) were not given adequate process.  They received no notice of YMTC and YMTJ's addition to the Entity List before its announcement on

or around December 15, 2022, and the December 2022 Final Rule identified no evidentiary basis for their addition.

231.    Three years later, Plaintiffs are still waiting for Defendants to reveal what, if any, evidentiary basis they relied upon in adding YMTC and YMTJ to the Entity List on the purported basis of "activity" presenting a "risk of diversion."

232.    Listing YMTC and YMTJ was not urgent and giving them advance notice of the reasons for the listing would not have been impractical.  BIS had been in communication with YMTC for two years before the December 2022 Final Rule was issued, as recently as two weeks before the listing, when BIS personnel successfully conducted the end-use site visit at YMTC's facilities in China.  Despite this, BIS did not inform YMTC beforehand that it was considering adding YMTC and/or YMTJ to the Entity List.

233.    Plaintiffs also received no meaningful post-deprivation notice or opportunity to be heard.  In meeting after meeting with Defendants, YMTC and its representatives sought information about what YMTC did to warrant placement on the Entity List and requested guidance about what it could do to get off the List—to no avail.  Because Plaintiffs have received no information about the basis for Defendants' assertion about YMTC and YMTJ's purported "activity" presenting a "risk of diversion," they have had no meaningful opportunity to rebut that assertion.

234.    YMTC's and YMTJ's post-listing removal requests and meetings with Defendants are also an inadequate substitute for pre-deprivation notice and opportunity to be heard, because removals from the Entity List are governed by a different standard than additions. *See supra* ¶¶ 62, 65-66.  Under Supplement No. 5, removal from the Entity List requires a unanimous vote (here, by four agency representatives).  By contrast, under Supplement No. 5's majority-vote requirement

for Entity List additions, if YMTC and YMTJ had received prior notice and an opportunity to be heard, they could have prevented their addition to the List by securing only two (out of four) agency votes.

235.     Moreover, the Entity List removal procedures do not state a deadline for Defendants to render a decision on a removal request.  The removal requests by YMTC and YMTJ have been pending for almost two and a half years, and Defendants have not provided any guidance about whether and when they will ever render a decision.

236.     The placement of YMTC and YMTJ on the Entity List is therefore unconstitutional because it deprived YMTC and YMTI of their liberty and property rights without due process.

237.     Defendants' unlawful acts have caused, are causing, and will continue to cause harm to Plaintiffs.

<u>**REQUEST FOR RELIEF**</u>

238.     WHEREFORE, Plaintiffs request that this Court:

a)     order Defendants to produce the basis for adding YMTC and YMTJ to the Entity List and whatever evidence upon which Defendants relied in making that determination, in the form of the administrative record, consistent with Local Civil Rule 7(n);

b)     declare that Defendants' placement of YMTC and YMTJ on the Entity List was *ultra vires*;

c)     declare that Defendants violated the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and acted otherwise contrary to law when they added YMTC and YMTJ to the Entity List;

d)     declare that 50 U.S.C. § 4813(a)(16) constitutes an unlawful delegation of legislative power;

e)      declare that 15 C.F.R. § 744.11(b)(5) is void for vagueness on its face and as applied to YMTC and YMTJ;

f)      order Defendants to remove YMTC and YMTJ from the Entity List;

g)      vacate the portion of the December 2022 Final Rule placing YMTC and YMTJ on the Entity List;

h)      enjoin Defendants from implementing or enforcing YMTC and YMTJ's Entity List designation;

i)      award Plaintiffs their costs and reasonable attorney's fees incurred in this action; and

j)      grant such other relief as the Court may deem just and proper.

Dated:  December 5, 2025.

Respectfully submitted,

*/s/ Murad Hussain*
ARNOLD & PORTER KAYE SCHOLER LLP
Deborah A. Curtis (D.C. Bar No. 451716)
Murad Hussain (D.C. Bar No. 999278)
Dana Kagan McGinley (D.C. Bar No. 1781561)
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel: (202) 942-5000
Deborah.Curtis@arnoldporter.com
Murad.Hussain@arnoldporter.com
Dana.KaganMcGinley@arnoldporter.com

*Attorneys for Plaintiffs*